## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

NDEYE NDOYE,                                    Case No. 1:15-cv-380
    Plaintiff,                                  Litkovitz, M.J.

    vs.

MAJOR PERFORMANCE LLC, *et al.*,                **ORDER**
    Defendants.

Plaintiff Ndeye Ndoye brings this action against defendants Major Performance LLC ("Major Performance"), Julie Majors, and three John Does under 42 U.S.C. §1985(3); the Ohio Consumer Sales Practices Act ("OCSPA"), Ohio Rev. Code §§ 1345.02 and 1345.03; and Ohio common law.[1]  This matter is before the Court on plaintiff's motion for partial summary judgment (Doc. 14), defendants' response in opposition (Doc. 29), and plaintiff's reply memorandum (Doc. 31).  This matter is also before the Court on defendants' motion for summary judgment (Doc. 30), plaintiff's response in opposition (Doc. 35), and defendants' reply memorandum (Doc. 36).

### I. Facts

Plaintiff is a native of Senegal, West Africa, who immigrated to the United States in 2003.  (Deposition of Ndeye Ndoye, Doc. 26 at 7).  Plaintiff alleges she is a naturalized United States citizen and a resident of Hamilton County, Ohio.  (Doc. 1 at ¶ 1).

Defendant Major Performance is an Ohio limited liability corporation that sells used motor vehicles at a sales facility in Hamilton, Ohio.  (Doc. 1 at ¶ 2; Doc. 5 at ¶ 4).  Defendant Majors has been the manager of Major Performance since July 2010.  (Deposition of Julie

---

[1] Plaintiff also named Westlake Services, LLC d/b/a Westlake Financial Services ("Westlake") as a defendant in her complaint, but she subsequently filed a notice of voluntary dismissal without prejudice as to Westlake.  (*See* Docs. 1, 6).

Majors, Doc. 28 at 25).[2]  Defendant Majors' husband, Lee Majors, has been the sole owner of

Major Performance since at least 2007.  (*Id.* at 15).

*The February 12, 2015 Vehicle Sale*

On February 12, 2015, plaintiff signed a retail purchase agreement to buy a 2006 Cadillac

STS from Major Performance.  (Retail Purchase Agreement (Buyers Order), Exh. 6A to Majors

deposition, Doc. 34-1 at 36).  Plaintiff made a partial payment of $3,500.00, leaving an unpaid

balance of $5,736.44.  (*Id.*).  The purchase agreement states that a partial payment is "not

refundable except as set forth in this Agreement."  (*Id.*).  In relevant part, the purchase agreement

states:

> **Your Failure to Perform Obligations:**  In the event of any failure by you to
> perform your obligations under this Agreement, including but not limited to, any
> failure to take delivery of or to pay the agreed upon price for the Vehicle, we shall
> be permitted to retain an amount equal to any actual damages we incur due to
> your default. . . .  We may keep any portion of the amount you have paid to us as
> a Deposit/Partial Payment . . . to offset against the amount you owe us.  If the
> actual amount you owe to us is greater than the amount of the Deposit/Partial
> Payment, you agree to pay the difference to us.  If the actual amount you owe is
> less than the amount of the Deposit/Partial Payment, we will pay the difference to
> you.

(*Id.* at 37).

`        As to the unpaid balance of $5,736.44 owed on the vehicle, plaintiff entered into a

financing agreement in which she agreed to pay 32 monthly payments of $247.37 at an annual

percentage rate of 24.99%.  (Retail Installment Contract and Security Agreement, Exh. 6M to

Majors deposition, Doc. 34-1 at 51).  The first monthly payment was due on March 14, 2015.

(*Id.*).  Plaintiff and Major Performance signed the agreement on February 12, 2015 and Major

Performance assigned the contract to Westlake, an automobile loan financing company, the same

day.  (*See id.* at 56).

_____

[2] Citations to this deposition refer to the page numbers provided by CM/ECF.

*The Credit Application*

To secure financing for the purchase, plaintiff signed a Westlake credit application on February 12, 2015. (Westlake Credit Application, Exh. 6L to Majors deposition, Doc. 34-1 at 50). In the application, plaintiff indicated that she worked as a machine operator for Mubea in Florence, Kentucky. (*Id.*). The application contains a handwritten notation indicating plaintiff earned $17.00 an hour. (*See id.*). Plaintiff testified that when she signed the application, the "$17/hr" notation was not written on the application and the space was left blank. (Doc. 26 at 81-82). She denied telling defendant Majors that she earned $17.00 per hour and denied that she wrote "$17/hr" on the application. (*Id.*). Plaintiff testified she informed defendant Majors that she earned $10.00 per hour as a temporary employee and that her wages would increase to $12.37 per hour when she became a permanent employee. (*Id.* at 83-84). Plaintiff testified that defendant Majors told her to bring in her check stubs. (*Id.* at 84-85).

Defendant Majors indicated that she made certain notations on the application after plaintiff signed it, but she did not identify plaintiff's hourly wage as one of these notations. (*See* Doc. 28 at 70-73). Defendant Majors did not offer any testimony concerning whether she or plaintiff entered an hourly wage of $17.00 on the application. (*See id.*).

*Plaintiff's Earnings Statement*

After plaintiff provided the $3,500.00 down payment and signed the purchase agreement, retail installment contract, and credit application, she received the keys to the 2006 Cadillac and left Major Performance's premises with the vehicle. (Doc. 26 at 65). Plaintiff and defendant Majors agreed that plaintiff would provide a copy of her earnings statement so that her income could be verified. (*See id.* at 66). The parties dispute when plaintiff was expected to provide that information.

3

Plaintiff testified that defendant Majors did not give her a time frame in which to provide Majors with a copy of the earnings statement. (*Id.* at 86). Plaintiff testified that she brought a copy of the earnings statement to defendant Majors on March 6, 2015, after receiving a telephone call from Majors on March 4, 2015. (*Id.* at 87-88). Plaintiff testified that during the March 4 call, Majors said that she needed the earnings statement. (*Id.* at 88). Plaintiff testified that she and Majors spoke "several times" between February 12 and March 4, 2015 and Majors did not request a copy of the earnings statement during those conversations. (*See id.* at 87-88).

Defendant Majors testified that she called plaintiff "several times" between February 12 and March 4, 2015 to request that plaintiff provide a copy of her earnings statement. (*See* Doc. 28 at 126-27). Defendant Majors testified that plaintiff brought a copy of her earnings statement to the Major Performance office "sometime after" March 4, 2015. (*Id.* at 127). The copy of plaintiff's earnings statement provided to defendant Majors is dated March 4, 2015 and shows that plaintiff's regular rate of pay was $10.00 an hour and her overtime rate was $15.00 an hour. (Earnings Statement, Exh. 8A to Majors deposition, Doc. 34-1 at 64). The earnings statement was issued by CM Services, Inc. for plaintiff's work for "customer" Mubea Precision Spring. (*Id.*).

## *The Vehicle's Title*

Defendant Majors gave plaintiff a temporary tag for the vehicle on February 12, 2015. (Doc. 28 at 136). The parties dispute the circumstances surrounding the failure of defendants to transfer the vehicle's title to plaintiff.

Plaintiff testified that she called defendant Majors several times between February 12 and March 6, 2015 "because [plaintiff] wanted [Majors] to have the title ready." (Doc. 26 at 91). Plaintiff testified that when she took her earnings statement to defendant Majors on March 6, 2015, she asked Majors about the title and Majors "said she's working on it." (*Id.* at 92-93).

4

Plaintiff testified that she asked Majors about the title again on March 14, 2015 and Majors "said she's still working on it." (*Id.* at 95-97).

Defendant Majors testified that plaintiff never asked about the title. (Doc. 28 at 138). Defendant Majors testified that as of March 16, 2015, she still had not applied for a certificate of title in plaintiff's name because the financing with Westlake was still pending. (*Id.* at 146-47). Defendant Majors testified that she provided plaintiff with a second temporary tag sometime before March 30, 2015. (*See id.* at 160, 165). Defendant Majors testified that Major Performance did not have a certificate of title to the vehicle issued in its name until March 10, 2015. (*Id.* at 118). Defendant Majors testified that title to the vehicle was not transferred into plaintiff's name within the time period required by the state of Ohio. (*See id.* at 93-94). Further, defendant Majors testified that the title was never transferred into plaintiff's name. (*Id.* at 94).

Records from the Hamilton County, Ohio Clerk of Courts show that the vehicle at issue was titled to Terance Schooler from January 17, 2014 until title was transferred to Major Performance on March 10, 2015. (Clerk of Court Records, Exh. 4C to Majors deposition, Doc. 34-1 at 27-29; *see also* Transfer of Title from Terance Schooler to Major Performance, Doc. 34-1 at 31). The vehicle remained titled to Major Performance until May 27, 2015 when title was transferred to Tequise Johnson. (*Id.* at 29). The county records do not indicate that the vehicle was ever titled to plaintiff. (*See id.*).

*The Late Payment and "Repossession"*

Under the installment contract, plaintiff's first monthly payment of $247.37 was due on March 14, 2015. (Exh. 6M to Majors deposition, Doc. 34-1 at 51). The parties dispute the circumstances surrounding the first monthly payment and the subsequent seizure of the vehicle.

Plaintiff testified that she called Westlake on March 14 to make the first payment. (Doc. 26 at 95). Plaintiff learned that Westlake had no record of an account in her name. (*Id.* at 96).

5

Plaintiff then called defendant Majors who "told [her] not to worry about it, she's working on it." (*Id.* at 97). Two weeks later, plaintiff was contacted by Westlake and discovered that her first payment was overdue. (*Id.* at 97-98). Plaintiff explained she had tried to make the payment to Westlake on March 14, but there was no account in her name. (*Id.* at 98). Plaintiff then worked out an agreement with Westlake to make the payment on April 10, 2015. (*Id.*). Plaintiff testified that she called Westlake on April 10, 2015 and made a credit card payment. (*Id.* at 99-100).

Defendant Majors testified that as of March 14, 2015, Westlake had still not approved plaintiff's financing. (*See* Doc. 28 at 151). Defendant Majors stated she believed Westlake had set up an account for plaintiff as of that date. However, she admitted she had no personal knowledge of Westlake's policy on assigning account numbers when a loan was not yet approved or whether plaintiff attempted to make an electronic payment to Westlake on March 14, 2015. (*Id.* at 151-52, 155-57).

Plaintiff has submitted the declaration of John Schwartz, a senior legal analyst for Westlake. (Declaration of John Schwartz, Doc. 35-1, Exh. A at ¶ 1). Mr. Schwartz attests that Westlake funded plaintiff's credit application on March 17, 2015 by transferring $3,957.45 to Major Performance in exchange for assignment of Major Performance's rights under the Retail Installment Contract and Security Agreement. (*Id.* at ¶ 6). Before Westlake funded plaintiff's loan, Westlake and defendants confirmed that plaintiff was employed by CM Services and earned $10.00 an hour. (*See* Earnings Statement, Exh. 8A to Majors deposition, Doc. 34-1 at 64; Ndeye Ndoye employment verification, Exh. 13 to Majors deposition, Doc. 34-1 at 87; E-mail from Melissa Bingaman to Major Performance dated March 17, 2015, Exh. 14 to Majors deposition, Doc. 34-1 at 88). Mr. Schwartz attests that Westlake established a loan account for plaintiff on March 17, 2015. (Doc. 35-1, Exh. A at ¶ 7). Mr. Schwartz further attests that Westlake never received a copy of the title from Major Performance and had not approved,

6

funded, or established a loan account for plaintiff as of March 14, 2015, the date the first payment was due. (*Id.* at ¶ 9).

Mr. Schwartz attests that Westlake sent a billing statement to plaintiff on March 25, 2015, advising her that her first payment was past due. (*Id.* at ¶ 10). On March 30, 2015, Westlake notified defendant Major Performance that plaintiff "has failed to tender by the due date specified in the Contract the One (1) payment due and payable to Westlake under the Contract." (Notice of Payment Default and Repurchase Demand, Exh. 17 to Majors deposition, Doc. 34-1 at 92; *see also* Doc. 35-1, Exh. A at ¶ 11). Westlake demanded that Major Performance "immediately repurchase this Contract by remitting the repurchase price" by April 6, 2015. (Exh. 17 to Majors deposition, Doc. 34-1 at 92). Mr. Schwartz attests that Major Performance did not comply with the repurchase demand by the April 6 deadline. (Doc. 35-1, Exh. A at ¶ 11).

Plaintiff testified that she called defendant Majors around April 10, 2015 to inquire about the title. (*See* Doc. 26 at 104). Plaintiff testified: "And [defendant Majors] told me she was still working on it but she needed to take a picture of the car. So she asked me to come by and so she can take a picture of the car. I thought she was going to take a picture of the car and give me my title." (*Id.*). Plaintiff testified that she and her husband drove to Major Performance on April 10, 2015, and when they arrived, employees of Major Performance's body shop blocked her vehicle in by parking other cars around it. (*Id.* at 104-05).

Plaintiff testified that after they entered the office at Major Performance, defendant Majors told her that Westlake "asked her to repo the car." (*Id.* at 106-07). Plaintiff asked how that was possible when she had made a payment to Westlake that morning. (*Id.* at 107-08). According to plaintiff, defendant Majors responded that "it doesn't matter, I'm repossessing the car." (*Id.* at 108). Plaintiff requested a refund of her down payment and first month's payment

in exchange for the vehicle, but her request was denied because Major Performance was repossessing the vehicle. (*Id.* at 108-09). The following day, after learning that Westlake had not ordered repossession of the vehicle, plaintiff again requested the return of her down payment from defendant Majors. (*Id.* at 112-13). Plaintiff testified that defendant Majors responded: "If you want your—what you going to do? If you want your money, you're going to have to sue me. Go back to Africa and swing them trees, where you from." (*Id.* at 113).

Defendant Majors testified that she did not recall telling plaintiff around April 9, 2015 that she needed to give plaintiff the title and get a photograph of the vehicle and that she had "no reason to take a photograph of the vehicle." (Doc. 28 at 170). Defendant Majors denied asking anyone to block in the vehicle when plaintiff brought the vehicle to Major Performance on April 10, 2015. (*Id.* at 173-74). After plaintiff stated she had made her first payment, defendant Majors called Westlake, confirmed the payment had been made, and believed Westlake would reimburse plaintiff for the payment. (*Id.* at 175). Defendant Majors testified that Major Performance did not receive the amount of plaintiff's first payment from Westlake and she could not recall having any phone conversations with plaintiff in the week after the vehicle was repossessed. (*See id.* at 176, 189-90).

In his declaration, Mr. Schwartz attests that on April 10, 2015, plaintiff made an electronic payment to Westlake of $252.37, consisting of the $247.37 monthly payment and a $5.00 convenience fee. (Doc. 35-1, Exh. A at ¶ 12). According to Mr. Schwartz, this payment rendered plaintiff's account under the contract "current." (*Id.*). Mr. Schwartz attests on April 13, 2015, Westlake reassigned the contract to Major Performance, informed Major Performance that plaintiff's account was current, and sent Major Performance plaintiff's April 10 payment. (*Id.* at ¶ 13; *see also* Reassignment of Contract, Exh. 21 to Majors deposition, Doc. 34-1 at 101).

Mr. Schwartz further attests that Westlake never ordered repossession of the vehicle. (*See* Doc. 35-1, Exh. A at ¶ 15).

## II. Summary Judgment Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Under Federal Rule of Civil Procedure 56(c), a grant of summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Satterfield,* 295 F.3d at 615; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enters., Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a *prima facie* case, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex* and *Anderson*). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

### III. Resolution

A. *Ohio Consumer Sales Practices Act*

The OCSPA prohibits unfair or deceptive acts or practices and unconscionable acts or practices in connection with a consumer transaction. Ohio Rev. Code §§ 1345.02(A) (unfair or deceptive), 1345.03(A) (unconscionable). Such an unfair, deceptive, or unconscionable act or practice "by a supplier violates this section whether it occurs before, during, or after the transaction." Ohio Rev. Code §§ 1345.02(A) (unfair or deceptive), 1345.03(A) (unconscionable). A car dealer is a "supplier" for purposes of the OCSPA. *See, e.g., Andrews v. Scott Pontiac Cadillac GMC, Inc.*, 594 N.E.2d 1127, 1130-31 (Ohio Ct. App. 1991). Unfair or deceptive consumer sales practices are those that mislead consumers about the nature of the product they are receiving; unconscionable acts or practices are those that manipulate a consumer's understanding of the nature of the transaction. *McKinney v. Bayer Corp.*, 744 F. Supp.2d 733, 743 (N.D. Ohio 2010) (citing *Whitaker v. M.T. Auto., Inc.*, 855 N.E.2d 825, 829 (Ohio 2006)).

Offering a vehicle for sale without complying with the title provisions in Ohio Rev. Code § 4505.181(B)(1) "constitutes a deceptive act or practice in connection with a consumer transaction and is a violation of [Ohio Rev. Code §] 1345.02[.]" Ohio Rev. Code § 4505.181(H). *See also Anousheh v. Planet Ford, Inc.*, No. 21960, 2007 WL 2482625, at *3 (Ohio Ct. App. Aug. 31, 2007). "In all cases of transfer of a motor vehicle . . . , the application for certificate of title shall be filed within thirty days after the assignment or delivery of the motor vehicle." Ohio Rev. Code § 4505.06(A)(5)(b). In addition, a car dealer may not sell "a motor vehicle without having obtained a manufacturer's or importer's certificate, a certificate of title, or an assignment of a certificate of title for it[.]" Ohio Rev. Code § 4505.18(A)(2). However, a used car dealer may offer for sale or sell a used car "without having first obtained a certificate of title for the

vehicle in the name of the dealer by complying with" certain requirements. Ohio Rev. Code §
4505.181(A). First, "[t]he dealer . . . shall possess a bill of sale for each used motor vehicle . . .
proposed to be displayed, offered for sale, or sold under this section or a properly executed
power of attorney or other related documents from the prior owner of the motor vehicle . . .
giving the dealer . . . authority to have a certificate of title to the motor vehicle . . . issued in the
name of the dealer[.]"  Ohio Rev. Code § 4505.181(A)(1).  Second, "[i]f a retail purchaser
purchases a used motor vehicle . . . for which the dealer . . . does not have a certificate of title
issued in the name of the dealer at the time of the sale, the retail purchaser has an unconditional
right to demand the dealer rescind the transaction if . . . [t]he dealer fails, on or before the fortieth
day following the date of the sale, to obtain a title in the name of the retail purchaser."  Ohio
Rev. Code § 4505.181(B)(1).

   Plaintiff argues that defendants committed an unfair or deceptive practice under Ohio
Rev. Code § 1345.02 by failing to apply for a certificate of title in plaintiff's name within 30
days of sale, in violation of Ohio Rev. Code § 4505.06(A)(5)(b).  (Doc. 14 at 3).  Plaintiff
contends that defendants also committed an unfair, deceptive, and unconscionable practice under
Ohio Rev. Code §§ 1345.02 and 1345.03 by failing to obtain a certificate of title in plaintiff's
name within 40 days of sale, in violation of Ohio Rev. Code §§ 4505.18(A)(2) and 4505.181(B).
(*Id.*).  Plaintiff argues that the undisputed facts show plaintiff purchased the vehicle at issue on
February 12, 2015, defendant Major Performance did not acquire title in its own name until
March 10, 2015, and title was never placed in plaintiff's name.  (*Id.* at 4).  Thus, plaintiff
contends she is entitled to summary judgment on her OCSPA claims.  (*Id.* at 5).

   Defendants respond that plaintiff's motion for partial summary judgment on her OCSPA
claims should be denied in accordance with the doctrine of avoidable consequences.  (Doc. 29 at
7).  Defendants argue that plaintiff was in breach of the purchase agreement because she

intentionally failed to verify information concerning the hourly wage she attested to on the credit application and she failed to make her first payment by the March 14, 2015 due date. (*Id.* at 7-9). Defendants contend that because of plaintiff's breach, they were required under the doctrine of avoidable consequences "to mitigate [their] damages and to repossess the Cadillac in order to realize the value of the security." (*Id.* at 9). Further, defendants argue that the motion for partial summary judgment should be denied in accordance with Ohio law on fraudulent misrepresentations because plaintiff falsely stated that: (1) she worked for Mubea rather than a temporary worker agency named CM Services; and (2) her rate of pay was $17.00 an hour when it was only $10.00 an hour. (*Id.* at 9-10). Defendants contend that plaintiff's misrepresentations voided the Retail Purchasing Agreement and Major Performance was entitled to rescind the Agreement before plaintiff's OCSPA claims became actionable. (*Id.* at 11). In other words, defendants argue that plaintiff is not entitled to judgment as a matter of law because she breached the contract before the 40-day period for defendants to obtain title in her name expired. (*See id.* at 11-13).

The undisputed facts show defendants did not apply for title in plaintiff's name within 30 days of the date of sale and did not issue title to plaintiff within 40 days of the date of sale. (*See* Doc. 28 at 93-94, 146-47). In fact, defendants do not dispute the fact that title was never transferred into plaintiff's name. (*Id.* at 94). County title records confirm this. (*See* Clerk of Court Records, Exh. 4C to Majors deposition, Doc. 34-1 at 29). Thus, there is no genuine issue of material fact as to whether defendants violated the OCSPA by failing to comply with the certificate of title requirements under Ohio law. Fed. R. Civ. P. 56(c). *See also Celotex Corp.*, 477 U.S. at 322.

Nevertheless, defendants argue plaintiff is not entitled to summary judgment on her OCSPA claims because she made fraudulent misrepresentations and breached her duties under

the Retail Purchasing Agreement before the time had expired for defendants to fulfill their titling obligations under the OCSPA. Therefore, the issue is whether a consumer's alleged breach of contract or fraudulent misrepresentation is a defense to a claimed violation of the OCSPA.

The defendants have not cited—and the Court has not found—any cases where a defendant relied on the doctrine of avoidable consequences, a plaintiff's fraudulent misrepresentation, or a plaintiff's breach of contract to escape liability for a defendant's violation of the OCSPA. The cases on which defendants rely concern mitigation of damages in actions brought for breach of contract (*see* Doc. 29 at 7-13), but plaintiff has not raised a breach of contract claim in this action and defendants have not pled a counterclaim for breach of contract. (*See* Doc. 1; Doc. 5). Further, even if defendants may raise these defenses in an OCSPA case, they go to the question of damages (which is not presently at issue), not liability under the OCSPA, the plain text of which requires a car dealer "in all cases" to file an application for certificate of title within thirty days of delivery of the vehicle to a consumer. *See* Ohio Rev. Code § 4506.06(A)(5)(b). Thus, because there is no dispute that Major Performance failed to comply with the OCSPA's titling requirements, it is liable under the OCSPA.

Further, the Supreme Court of Ohio has explained that because "[t]he [O]CSPA is remedial in nature, having been designed to compensate for incomplete remedies available at common law," courts "must liberally construe the statute in favor of the consumer." *Anderson v. Barclay's Capital Real Estate, Inc.*, 989 N.E.2d 997, 1000 (Ohio 2013) (citing *Einhorn v. Ford Motor Co.*, 548 N.E.2d 933, 935 (Ohio 1990)). Despite the Supreme Court of Ohio's instruction on the OCSPA's remedial nature in favor of the consumer, defendants now ask this Court to liberally construe the statute in *their* favor—thereby allowing them to skirt liability by importing breach of contract defenses into an OCSPA action—without any support in the statutory text or

Ohio law for doing so. Defendants' argument is contrary to the remedial nature of the OCSPA, and this provides a secondary basis for granting plaintiff's motion.

Based on the foregoing, plaintiff's motion for partial summary judgment is granted as to plaintiff's claims that defendants violated Ohio Rev. Code § 1345.02(A) by committing unfair or deceptive acts in not applying for and providing plaintiff with a certificate of title as required by Ohio Rev. Code §§ 4505.06(A)(5)(B), 4505.18(A)(2), and 4505.181(B)(1).

However, the Court denies plaintiff's motion for partial summary judgment as to plaintiff's claim that defendants' failure to comply with title requirements was also "unconscionable" under Ohio Rev. Code § 1345.03(A). Ohio law provides that a dealer's failure to comply with the title requirements "constitutes a *deceptive* act or practice in connection with a consumer transaction and is a violation of [Ohio Rev. Code §] 1345.02[.]" Ohio Rev. Code § 4505.181(H) (emphasis added). In contrast, Ohio law does not provide that a dealer's failure to comply with the title requirements is also necessarily *unconscionable*. Ohio courts have recognized that in order to establish unconscionability on the part of a supplier under the OCSPA, "the consumer must demonstrate intent." *Hayes v. Osterman Jewelers*, No. L-01-1317, 2002 WL 1608445, at *3 (Ohio Ct. App. Apr. 19, 2002) (citing *Karst v. Goldberg*, 623 N.E.2d 1348, 1350-51 (Ohio Ct. App. 1993)). *See also Hamilton v. Ball*, 7 N.E.3d 1241, 1254 (Ohio Ct. App. 2014). The issue of whether defendants had the requisite intent to render their actions unconscionable under the OCSPA is a question of fact for the jury to decide. Thus, summary judgment is denied as to plaintiff's unconscionability claim under Ohio Rev. Code § 1345.03(A). Finally, consistent with the foregoing, defendants' cross-motion for summary judgment is denied as to plaintiff's OCSPA claims.

14

B. *Fraud*

In their cross-motion for summary judgment, defendants seek judgment as a matter of law on plaintiff's fraud claim. (Doc. 30 at 14-15).

In Ohio, the elements of fraud are: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998).

Defendants argue that plaintiff cannot satisfy the elements of justifiable reliance and an injury proximately caused by the reliance. As to justifiable reliance, defendants argue that plaintiff did not pay for the vehicle and acknowledged that she had no right to the vehicle if she did not make the payments. However, a reasonable jury could find that plaintiff did pay for the vehicle as evidenced by her $3,500.00 down payment, the $252.37 payment she made on April 10, 2015, and Mr. Schwartz's declaration that her account was current on April 10, 2015, the day that defendants seized the vehicle. (Schwartz Declaration, Doc. 35-1, Exh. A at ¶ 12). Further, because a reasonable jury could find that plaintiff did pay for the vehicle, and thus justifiably relied on defendants' alleged representations concerning the title, the jury could also reasonably find that plaintiff suffered an injury proximately caused by her reliance inasmuch as defendants seized the car and refused to refund the $3,500.00 down payment and the $252.37 payment she made on April 10. Accordingly, defendants' motion for summary judgment is denied as to this claim.

C. *Conspiracy Claims*

To maintain a federal cause of action for conspiracy under § 1985(3), a plaintiff must

establish the following:

(1) a conspiracy involving two or more persons (2) for the purposes of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States.

*Smith v. Thornburg*, 136 F.3d 1070, 1078 (6th Cir. 1998) (quoting *Johnson v. Hills & Dales Gen.*

*Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994)). "The plaintiff further must demonstrate that the

conspiracy was motivated by a class based animus, such as race." *Id.* (citing *Johnson*, 40 F.3d at

839; *Collyer v. Darling*, 98 F.3d 211, 233 (6th Cir. 1996)).

A civil conspiracy under Ohio law is "a malicious combination of two or more persons to

injure another in person or property, in a way not competent for one alone, resulting in actual

damages." *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998). Malice for purposes

of a state law conspiracy claim involves "that state of mind under which a person does a

wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Id.*

(citation and quotation marks omitted). An essential element of a state law conspiracy claim is

the existence of an underlying unlawful act independent of the actual conspiracy. *Id. See also*

*Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 629 N.E.2d 28, 33 (Ohio Ct. App.

1993).

Defendants seek summary judgment on plaintiff's federal and state law conspiracy

claims. Defendants argue they did not deprive plaintiff of any right or privilege for purposes of

42 U.S.C. §1985(3) because they lawfully repossessed the vehicle after plaintiff breached the

Retail Purchase Agreement. (Doc. 30 at 15). Further, defendants argue there was no evidence

that racial animus motivated the repossession because the alleged racial epithets "were not

uttered until the day after the vehicle was lawfully repossessed." (*Id.* at 16). Defendants also contend plaintiff offered no evidence of concerted action on the part of the defendants. (*Id.*). As to plaintiff's state law civil conspiracy claim (Doc. 1, Count 6), defendants argue there is no evidence to support a finding that they engaged in an unlawful action. (Doc. 30 at 17).

Summary judgment is not warranted on plaintiff's civil rights claim as there are genuine issues of material fact as to whether defendants deprived plaintiff of equal protection of the law based on her African ethnicity. A reasonable jury could determine that plaintiff did not breach the Retail Installment Contract and Security Agreement and the seizure of the vehicle by defendants was not a lawful repossession. Although defendants allege that plaintiff breached the installment contract by not timely making her first payment, plaintiff presents evidence from which a reasonable jury could conclude that defendants' actions, and not plaintiff's, prompted plaintiff's failure to pay the installment on March 14, 2015 as required under the contract. Plaintiff presents evidence that she attempted to make her first payment to Westlake but was unsuccessful because Westlake had not yet created an account for her at that time. (Doc. 26 at 95-96). Mr. Schwartz confirmed that Westlake did not establish a loan account for plaintiff until March 17, 2015, after the first payment was allegedly due under the Retail Purchase Agreement. (Declaration of John Schwartz, Doc. 35-1, Exh. A at ¶ 7). Further, plaintiff testified that she called Westlake on April 10, 2015 and made a credit card payment, which Mr. Schwartz confirmed. (Doc. 26 at 99-100; Doc. 35-1, Exh. A at ¶ 12). Notably, even defendant Majors testified that she confirmed with Westlake that plaintiff "had made the payment, but the order to rescind the deal was already in place." (Doc. 28 at 175). In addition to the evidence showing that plaintiff was current on her payments at the time defendants seized the vehicle, there is evidence that Westlake did not order repossession of the vehicle as defendant Major allegedly represented to plaintiff. (Doc. 35-1, Exh. A at ¶ 15). Additionally, Westlake did not reassign the

contract to defendant Major Performance until April 13, 2015, which was after defendants seized the vehicle. (*See id.* at ¶ 13). Defendants dispute plaintiff's version of events and it is the duty of the trier of fact to resolve the disputed issues of fact at trial. Because a jury could reasonably conclude that defendants' seizure of plaintiff's vehicle was not a lawful repossession, defendants' motion for summary judgment on both the § 1985(3) and state law civil conspiracy claims must be denied.

Moreover, plaintiff has presented evidence from which a reasonable jury could conclude that defendant Majors' actions were motivated by racial animus. Plaintiff testified that the day after defendants seized the vehicle, defendant Majors told her to "[g]o back to Africa and swing them trees, where you from." (Doc. 26 at 113). Defendants argue that even accepting that these statements were made, there is no evidence of racial animus at the time of defendants' seizure of the vehicle because plaintiff testified the statements were made the day after the seizure of the vehicle. However, a jury could reasonably conclude from the close proximity in time between defendant Majors' alleged statement and the seizure of the vehicle only one day prior that defendant Majors' actions were motivated by racial animus.

Plaintiff also presents evidence from which a reasonable jury could find that defendants engaged in concerted action to deprive plaintiff of her right to equal protection. Plaintiff testified that when she arrived at Major Performance on April 10, 2015, several John Does surrounded the vehicle with other cars, blocking it in. (*See* Doc. 26 at 104-05). While these individuals are not defendants in this action,[3] a plaintiff may rely on the actions of non-defendant co-conspirators to establish concerted action. *See, e.g., Jones v. Tozzi*, No. 1:05-cv-148, 2006 WL 1582311, at * 9 (E.D. Cal. Jun. 2, 2006) (explaining that to establish concerted action under § 1985, a plaintiff must show "that defendants (or defendant and non-defendant co-conspirators) conspired");

---

[3] Plaintiff has neither identified nor served such individuals in this case.

*Dreyer v. Jalet*, 349 F. Supp. 452, 472 (S.D. Tex. 1972) (analyzing civil conspiracy between a defendant and a non-defendant co-conspirator). Based on plaintiff's testimony, a reasonable jury could conclude that these alleged John Doe co-conspirators were acting in concert with defendant Majors to unlawfully seize the vehicle from plaintiff.[4]

In sum, the determination of whether plaintiff's or defendants' account of what occurred on April 10, 2015 and the following days is credible is a matter for the jury to decide. If the jury believes the evidence that plaintiff has presented, it could reasonably find that defendants violated §1985(3) and/or engaged in a civil conspiracy. Accordingly, defendants' motion for summary judgment is denied as to these claims.

D. *Conversion (Automobile Theft)*

"Conversion has been defined as 'a wrongful exercise of dominion over property in exclusion of the right of the owner, or withholding it from [her] possession under a claim inconsistent with [her] rights.'" *NPF IV, Inc. v. Transitional Health Servs.*, 922 F. Supp. 77, 81 (S.D. Ohio 1996) (quoting *Zacchini v. Scripps-Howard Broad. Co.*, 351 N.E.2d 454, 456 (Ohio 1976), *rev'd on other grounds*, 433 U.S. 562 (1977)). To establish a claim of conversion in Ohio, a plaintiff must prove: (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages. *Id.* (citing *Haul Transp. of VA, Inc. v. Morgan*, No.

---

[4] The Court notes that under the intracorporate conspiracy doctrine, where "all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy." *Amadasu v. The Christ Hosp.*, 514 F.3d 504, 507 (6th Cir. 2008) (citing *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 510 (6th Cir. 1991)). Plaintiff testified that she believed the three individuals who blocked in the vehicle at Major Performance were employees in the body shop at Major Performance. (See Doc. 26 at 105). However, defendant Majors testified that there was only one employee, i.e., James Ballard, working in the body shop in April 2015. (See Doc. 28 at 31-33, 191). Whether these individuals were employees of Major Performance and part of the same "collective entity" such that plaintiff's claim would be barred by the intracorporate conspiracy doctrine is not before the Court as defendants have not sought dismissal of the conspiracy claims on the basis of the intracorporate conspiracy doctrine. (*See* Doc. 30 at 15-17).

CA 14859, 1995 WL 328995 (Ohio Ct. App. Jun. 2, 1995); *Fayette Inv. Corp. v. Jack Johnson Chevrolet Co.*, 197 N.E.2d 373 (Ohio Ct. App. 1963)).

Defendants argue that plaintiff did not possess a right to ownership or possession of the vehicle. (Doc. 30 at 16). Defendants contend plaintiff lost her rights in the vehicle by making misrepresentations on her credit application, refusing to provide verification of information on her credit application, and failing to make a payment on March 14, 2015. (*Id.*). Defendants argue that under the security agreement, they had the right to repossess the vehicle when plaintiff defaulted on the contract. (*Id.* at 16-17).

As explained above, genuine issues of material fact exist as to whether plaintiff breached the contract in any of the ways defendants claim. Further, a reasonable jury could find that defendants did not have a lawful right to repossession under the security agreement because Major Performance assigned the security agreement to Westlake on February 12, 2015 and Westlake did not reassign the security agreement to Major Performance until April 13, 2015, after defendants had already seized the vehicle. (*See* Retail Installment Contract and Security Agreement, Exh. 6M to Majors deposition, Doc. 34-1 at 56; Reassignment of Contract, Exh. 21 to Majors deposition, Doc. 34-1 at 101). Thus, a reasonable jury could find in plaintiff's favor on her conversion claim. Accordingly, defendants' motion for summary judgment is denied as to this claim.

E. *Conversion of Money*

Defendants argue that plaintiff has no right to have the $3,500.00 down payment returned to her because the retail purchase agreement stated that the down payment was not refundable. (Doc. 30 at 17). Whether defendant Major Performance has the right to retain the $3,500.00 down payment depends on whether plaintiff breached the purchase agreement, which as explained above is disputed.

Even if plaintiff was in breach, plaintiff may still prevail under the terms of the purchase agreement, which provides that the down payment is not refundable "except as set forth in this Agreement." (Retail Purchase Agreement (Buyers Order), Exh. 6A to Majors deposition, Doc. 34-1 at 36). The agreement provides that in the event of a breach, defendant Major Performance is only "permitted to retain [from the down payment] an amount equal to any actual damages we incur due to your default." (*Id.* at 37). The agreement further provides that "[i]f the actual amount you owe is less than the amount of the [down payment], we will pay the difference to you." (*Id.*). The parties have not provided any evidence from which to calculate the amount of actual damages attributable to plaintiff's alleged breach, but the Court notes that defendants were able to sell the vehicle to another buyer less than two months after seizing it from plaintiff. (*See* Clerk of Court Records, Exh. 4C to Majors deposition, Doc. 34-1 at 29). Given that defendants were able to mitigate any actual damages by reselling the vehicle, a jury could reasonably determine that defendants' actual damages attributable to plaintiff's alleged breach are less than the $3,500.00 down payment. Because a reasonable jury could find that defendants converted at least some of plaintiff's down payment, regardless of whether plaintiff was in breach, defendants' motion for summary judgment is denied as to this claim.

**IV. Conclusion**

Consistent with the foregoing, plaintiff's motion for partial summary judgment (Doc. 14) is **GRANTED** as to her claims that defendants violated Ohio Rev. Code § 1345.02(A) by committing unfair or deceptive acts, but is **DENIED** as to her claim that defendants violated Ohio Rev. Code § 1345.03(A) by committing unconscionable acts. Defendants' cross-motion

for summary judgment (Doc. 29) is **DENIED** in all respects.

 **IT IS SO ORDERED.**

Date: 7/28/16

Karen L. Litkovitz
United States Magistrate Judge