# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

NDEYE NDOYE,
    Plaintiff,

vs.

MAJOR PERFORMANCE LLC, *et al.*,
    Defendants.

Case No. 1:15-cv-380
Litkovitz, M.J.

**ORDER**

    Plaintiff Ndeye Ndoye brings this action against defendants Major Performance LLC,

Julie Majors, and three John Does under 42 U.S.C. § 1985(3); the Ohio Consumer Sales

Practices Act ("OCSPA"), Ohio Rev. Code §§ 1345.02 and 1345.03; and Ohio common law.

Plaintiff claims that defendants unlawfully repossessed the vehicle she purchased from Major

Performance, which resulted in the loss of her employment and severe economic hardship. This

matter is before the Court on defendants' motion for sanctions (Doc. 48), plaintiff's response in

opposition (Doc. 53), defendants' reply memorandum (Doc. 56), and defendants' supplemental

reply memorandum (Doc. 62). The Court held an evidentiary hearing in this matter on

December 12, 2016. (Doc. 78). After the hearing, defendants (Doc. 79) and plaintiff (Doc. 80)

submitted closing argument briefs.

    Defendants' motion for sanctions seeks dismissal of plaintiff's complaint with prejudice

based on plaintiff's alleged misconduct during the course of these proceedings. Defendants

assert that only after discovery was closed, dispositive motions were ruled on, and court-

facilitated mediation resulted in an impasse, did they uncover evidence establishing that plaintiff

had made materially false statements in her deposition, answers to interrogatories, and pleadings

filed with the Court in an effort to artificially inflate the amount of her damages claim at trial.

Defendants contend that plaintiff's intentional misrepresentations have irreparably harmed their

ability to defend this action and no sanction less than dismissal would adequately address plaintiff's misconduct.

Plaintiff asserts that defendants, through their motion for sanctions, ask this Court to invade the fact-finding province of the jury whose role is to weigh evidence, evaluate credibility, and draw inferences from testimony and written exhibits. Plaintiff contends the evidence before the Court amounts to nothing more than a garden-variety dispute of material fact—with one party accusing the other of lying—which is not uncommon in the great majority of civil disputes. Plaintiff asserts that her actions in this case have done nothing to impair or inhibit the operation of the judicial process and that this case should be decided by the jury at trial, and not by the Court.

For the reasons that follow, the Court concludes that defendants' motion is well-taken and it is therefore granted.

## I.  Summary of Evidence and Background

### A.  Course of Proceedings

Plaintiff is a native of Senegal, West Africa, who immigrated to the United States in 2003. (Deposition of Ndeye Ndoye, Doc. 26 at 7). In June 2015, plaintiff filed her complaint in this action raising numerous claims related to defendants' allegedly unlawful seizure on April 10, 2015 of a 2006 Cadillac STS that plaintiff purchased from defendant Major Performance in February 2015. (*See generally* Doc. 1). Plaintiff alleges that "[a]fter Defendants seized her vehicle, [she] was left without transportation, was unable to meet [her] work schedule requirements, and had to leave her job." (*Id.* at ¶ 24). Plaintiff alleges damages in excess of $25,000 related to defendants' actions. (*See id.* at ¶¶ 27, 30, 39).

In July 2016, the Court granted plaintiff's motion for partial summary judgment as to her claim that defendants violated Ohio Rev. Code § 1345.02(A) by committing unfair or deceptive acts in not applying for and providing plaintiff with a certificate of title for the Cadillac as required by the OCSPA. (*See* Doc. 37 at 10-14). The Court denied defendants' cross-motion for summary judgment in all respects. (*See id.* at 15-22). Thus, the parties proceeded with trial preparations as to plaintiff's remaining claims.

On October 7, 2016, the parties participated in judicial-based mediation, but were unable to settle the case. (*See* dkt. entry dated Oct. 7, 2016). On October 18, 2016, defendants moved to continue the trial set for November 7, 2016 due to unexpected complications from defense counsel's major surgery. (*See* Doc. 42). In opposing the motion for continuance, plaintiff argued that a delay was unfair to her because defendants "continue to hold her money, preventing her from acquiring transportation for a job needed to provide for herself." (Doc. 43 at 2). The Court granted the motion for continuance and reset the trial for December 12, 2016. On October 25, 2016, defendants filed the instant motion for sanctions, asserting that they had recently discovered information to show that plaintiff misrepresented her employment status and access to transportation in her answers to interrogatories, deposition testimony, and pleadings to inflate her damages. (*See* Doc. 48 at 1-2).

### B. Plaintiff's December 2015 Answers to Interrogatories

Specifically, defendants point to the following answers to interrogatories that plaintiff provided in December 2015 as containing false statements:

> 10. Please list each job or employment you have had for the previous ten years, including date hired, last date worked and reason for leaving said employment.

ANSWER: 11/2014-04/2015: MUBEA (through CM Services). Last day worked: 04/10/2015. Left because lacked transportation. 2005-2012 Champion Windows. Left due to pregnancy.

. . .

18. If you have lost any income from employment as a result of the acts alleged in the Complaint, list the inclusive dates of each period of employment which you have lost income and the total amount of income lost. Please produce copies of any documentary evidence you will rely upon at trial to support a claim of lost income.

ANSWER: April 13, 2015 to the present at a loss rate reflected in pay stubs from MUBEA less any income derived from occasionally babysitting.

. . .

22. Have you ever purchased any other vehicles? If so, please state:
   a. Location of the vehicle purchase;
   b. Entity or individual the vehicle was purchased from;
   c. Description of the vehicle purchased;
   d. Date on which the vehicle was purchased; and,
   e. Whether or not the vehicle was financed.

ANSWER: My husband and I purchased a 2010 Dodge Charger financed through GM Financial in 2011 from Jake Sweeney, and I co-signed the loan.

(Plaintiff's Response to Defendants' Discovery Requests, Doc. 48-1, Exh. A at 4-6). Plaintiff

signed and swore before a notary public that her answers to the interrogatories "are true and

correct to the best of my knowledge, information, and belief." (*Id.* at 7).

**C. Plaintiff's March 2016 Deposition Testimony**

Further, the following testimony from plaintiff's March 2016 deposition is relevant to

defendants' contention that plaintiff has misrepresented her unemployment:

Q. So the only information that you received from Mubea was that you missed work and that you were terminated?
A. Yes.
Q. When was that?
. . .
A. It should be on my records. I think it's Monday the 15th of April.
Q. Monday, April 15th, that would have been in 2015?

4

A.  Yes.
. . .
Q.  And why did you miss work?
A.  Because my car was repossessed and I had to work, go to work the next
morning.
. . .
Q.  And have you had any employment since?
A.  I was looking for a lot of employment and everything, but right now I'm still
unemployed.
Q.  So you've been unemployed since April 15, 2015?
A.  Yes, sir.

(Doc. 26 at 23-25).  As to defendants' contention that plaintiff misrepresented her lack of access

to a vehicle after defendants seized the Cadillac, the following deposition testimony is relevant:

Q.  Okay.  Have you and your husband purchased a car since Major Performance?
A.  No.
Q.  So you and your husband don't have a car right now?
A.  No.
Q.  And haven't had a car since?
A.  No.
Q.  Why haven't you purchased a car?
A.  Because we don't have the money to purchase a car.
Q.  How is your husband getting to work?
A.  Take the bus.
. . .
Q.  Okay.  And he's been taking the bus since he's been working at Mubea?
A.  Yeah.

(*Id.* at 115-16).

### D. Post-April 2015 Traffic Citations and Title Records

The record shows that on March 10 and April 26, 2016, plaintiff received traffic citations

while driving a 1997 Pontiac Bonneville.  (*See* March 10, 2016 Uniform Citation, Doc. 48-2,

Exh. B at 2; April 26, 2016 Uniform Citation, Doc. 48-3, Exh. C at 3).  Records from the

Hamilton County, Ohio Clerk of Court establish that a 1997 Pontiac Bonneville was titled in

plaintiff's name with a purchase date of June 27, 2015.  (Pontiac Bonneville Title Record, Doc.

48-4, Exh. D at 3-4).  A replacement title on this vehicle was issued on January 25, 2016 after a

lien was placed on the vehicle by Ohio Auto Loan Services. (*Id.* at 1-2). Further, title records show that a 2000 Volkswagen Jetta was titled in plaintiff's name with a purchase date of July 6, 2015. (Volkswagen Jetta Title Record, Doc. 48-5, Exh. E at 1-2).

### E. January 2016 Title Loan

On January 23, 2016, plaintiff applied for a title loan on the Pontiac Bonneville from Ohio Auto Loan Services. (*See* Customer Application dated Jan. 23, 2016, Doc. 48-6, Exh. F at 1-2; Doc. 78 at 73-80). In her application, plaintiff represented that she had been employed by Mubea Precision Spring for two years as a visual inspector. (Doc. 48-6, Exh. F at 1). Plaintiff indicated that her supervisor's name was Alex. (*Id.*). Plaintiff represented that she was paid $900 every two weeks. (*Id.*). To obtain the title loan, plaintiff provided a copy of her pay history from Mubea for calendar year 2015, which showed that she had gross earnings of $27,876.77 for that year. (*See* Mubea Pay History for 2015, Doc. 48-7, Exh. G; Doc. 78 at 76).

### F. Plaintiff's October 2016 Opposition to Defendants' Continuance Motion

On October 18, 2016, defendants moved to continue the trial set for November 7, 2016 due to unexpected complications from defense counsel's major surgery. (*See* Doc. 42). In opposing the motion, plaintiff asserted that "[a] delay has real, day-to-day financial consequences on her: defendants continue to hold her money, preventing her from acquiring transportation for a job needed to provide for herself." (Doc. 43 at 2).

### G. Plaintiff's November 2016 Declaration

In opposing the motion for sanctions and responding to the evidence described above, plaintiff filed a declaration dated November 14, 2016. (Declaration of Ndeye Ndoye dated Nov. 14, 2016, Doc. 53-1, Exh. A). Plaintiff attests in this declaration that she has not worked at Mubea or anywhere else since April 2015. (*Id.* at ¶ 2). Plaintiff attests that after defendants

6

seized the Cadillac on April 10, 2015, she allowed an undocumented Senegalese immigrant named Binta to work under plaintiff's name at Mubea. (*Id.* at ¶¶ 3-6).

### H. The December 2016 Evidentiary Hearing

#### *1. Plaintiff's Testimony*

At the evidentiary hearing, plaintiff testified that she was not employed in December 2015 when she completed her answers to interrogatories. (Doc. 78 at 12). As to the Pontiac Bonneville and Volkswagen Jetta titled in her name, plaintiff testified that her husband purchased those vehicles by himself but titled them in her name "[b]ecause of his tax problem." (*Id.* at 13). Plaintiff stated she had occasional use of the vehicle for "[j]ust going to th[e] store. That's about it." (*Id.* at 17). Plaintiff testified that she "was not employed at Mubea after . . . April of 2015. I didn't work at Mubea again." (*Id.* at 20). Plaintiff testified that while she later worked for four days at L'Oreal after being placed there by staffing agency CM Personnel, she did not consider that a job because "[i]t was just a tryout job, and it didn't work out." (*Id.* at 22).

Plaintiff testified that she accompanied her husband to secure a title loan on the Pontiac Bonneville. (*Id.* at 26-27). She stated that she did not assist in filling out the loan application and did not provide any information for the loan application. (*Id.* at 27-28). She testified that her husband provided all the information to complete the loan application and she merely signed it after the loan officer completed the form. (*Id.* at 28).

Plaintiff testified that when she became a direct employee of Mubea in March 2015, she signed a form directing her compensation be paid to Skylight, which was a Visa card associated with her bank account. (*Id.* at 40-41). When she completed this form, she asked for the Skylight account to be associated with a bank routing number ending in "1241" and an account number

ending in "6358." (*Id.* at 41; Skylight Financial Form, Plaintiff's Exh. A from Evidentiary Hearing, Doc. 74 at 1-2).

Plaintiff testified that records of phone calls made from her cell phone were consistent with calls that she made to the Legal Aid Society of Cincinnati on April 13, 2015 at 3:17 p.m., April 14, 2015 at 1:41 p.m. and 3:19 p.m., and April 17, 2015 at 9:40 a.m. (Doc. 78 at 42-43; Boost Account Activity, Plaintiff's Exh. B from Evidentiary Hearing, Doc. 74-1 at 45-46). Plaintiff testified that she also made calls from her cell phone to her attorney on April 26, 2015 at 7:25 p.m. and April 28, 2015 at 12:08 p.m. and 1:06 p.m. (Doc. 78 at 43-44; Doc. 74-1 at 52).

Plaintiff was also asked whether she had signed numerous employment related forms at Mubea after April 10, 2015. Plaintiff declined to answer these questions and asserted her Fifth Amendment right against self-incrimination. (Doc. 78 at 45-48).

Plaintiff testified she did not receive any income in the form of wages or benefits from Mubea after April 10, 2015. (*Id.* at 48).

### 2. Holly Holte's Testimony

Holly Holte, employee relations manager at Mubea, testified that plaintiff worked at Mubea from March 2015 until May 6, 2016 when she was terminated for attendance problems. (*Id.* at 49-50, 52-53). Ms. Holte authenticated plaintiff's personnel records, which included a safety glasses order form that plaintiff signed on April 24, 2015, a code of conduct policy certification that plaintiff signed on October 15, 2015, a flexible spending account enrollment form that plaintiff signed on April 24, 2015, and a "no changes" to insurance benefits form that plaintiff signed on November 21, 2015. (*Id.* at 50-51, 55-58; Defendants' Exhibit 5 from Evidentiary Hearing, Doc. 75-4 at 14, 20, 31, 43). Each of these forms was signed after the date plaintiff alleges she stopped working at Mubea.

8

Plaintiff's counsel asked Ms. Holte whether Mubea was able to produce records that would show the days that plaintiff worked and the hours she worked on each of those days. (Doc. 78 at 60). Ms. Holte testified that such a report could be produced. (*Id.*). More specifically, plaintiff's counsel asked: "[I]f I wanted to find out whether on the days that [plaintiff] met with me at my office or met with Legal Aid Society, whether . . . your records show her to be working . . . on those days, I would need to get Mubea's listing of the hours worked per day on a given date, right?" (*Id.* at 67). Ms. Holte testified that records showing the days and hours an employee worked could be produced, but she did not know if such records would go back to 2015. (*Id.*). Upon plaintiff's motion, and without objection, the Court directed Ms. Holte to produce on behalf of Mubea the record of hours that plaintiff worked in April 2015 and March 2016 for the purpose of comparison to plaintiff's phone records. (*Id.* at 69-70).

Plaintiff's counsel also asked Ms. Holte to examine copies of plaintiff's official pay records. (*Id.* at 62; Paycor Records, Plaintiff's Exh. C from Evidentiary Hearing, Doc. 74-2). Based on these records, Ms. Holte testified that for days worked between March 8 through May 2, 2015, plaintiff's earnings were deposited to a bank with a routing number ending in "1241" and an account number ending in "6358." (Doc. 78 at 62-63; Doc. 74-2 at 21-24). Ms. Holte testified that for days worked from May 3, 2015 throughout the rest of 2015 and into 2016, plaintiff's earnings were deposited to a different account number ending in "3202" at a different bank with a routing number ending in "6656." (Doc. 78 at 63-64; Doc. 74-2 at 3-20, 25-34).

### 3. Alexander Hensley's Testimony

Alexander Hensley, a production supervisor at Mubea, identified plaintiff as an employee he supervised from May 2015, when he transferred to plaintiff's shift, until her termination in

May 2016. (Doc. 78 at 71). Mr. Hensley testified that plaintiff was the only Senegalese immigrant with whom he has ever interacted at Mubea. (*Id.* at 72-73).

### 4. Samantha Banks' Testimony

Samantha Banks, an employee of Ohio Auto Loan Services, processed the title loan on the Pontiac Bonneville. (*Id.* at 73-75). Ms. Banks identified plaintiff and testified that plaintiff provided the title to the Pontiac Bonneville and filled out a loan application. (*Id.* at 75). Ms. Banks further testified that plaintiff provided a copy of her income history from Mubea for calendar year 2015 and a Mubea pay stub from January 9, 2016. (*Id.* at 75-76). Ms. Banks testified that she asked plaintiff for proof of income to determine how plaintiff "would be able to pay the loan back." (*Id.* at 76). Plaintiff represented to Ms. Banks that the Pontiac Bonneville was her vehicle. (*Id.* at 77). Ms. Banks testified that plaintiff's husband never indicated that the car was his. (*Id.* at 80).

### 5. Jeneen Stewart Grant's Testimony

Jeneen Stewart Grant, assistant chief deputy of the Hamilton County Clerk of Courts Auto Title Division, authenticated the title records for the Pontiac Bonneville and Volkswagen Jetta. (*Id.* at 81-82, 84-85). Ms. Grant testified that these documents established that plaintiff purchased the Pontiac Bonneville on June 27, 2015 and the Volkswagen Jetta on July 6, 2015. (*Id.* at 86-87). Ms. Grant testified that in order to receive title for these vehicles, plaintiff had to swear before a notary public that she had purchased the vehicles. (*See id.* at 87-88).

### 6. Amy Eversole's Testimony

Amy Eversole, a branch manager for staffing agency CM Personnel, authenticated the records in plaintiff's file with CM Personnel. (*Id.* at 90-92). Ms. Eversole testified that those records showed that plaintiff was placed in a job with L'Oreal in May 2016. (*Id.* at 92). Ms.

Eversole testified that plaintiff was terminated by L'Oreal on June 1, 2016 for attendance problems. (*Id.* at 98). Ms. Eversole testified that plaintiff's pay records for the L'Oreal position were consistent with plaintiff's contention that she only worked there for four days before being terminated. (*Id.* at 101-02).

### 7. Clifford Johnson's Testimony

Clifford Johnson testified that he has been married to plaintiff for nine years. (*Id.* at 104). Mr. Johnson testified that when he gets a car, he "usually put[s] it in [plaintiff's] name because [he has] tax issues." (*Id.* at 108). Mr. Johnson testified that during 2015, plaintiff was not working at Mubea and was not working at all. (*Id.* at 113). When asked what plaintiff was doing with her time, Mr. Johnson testified: "Really, I have no idea really. I don't know. I don't. I don't know." (*Id.*).

Mr. Johnson testified that he used his money to buy the Volkswagen Jetta and Pontiac Bonneville and that plaintiff had no involvement in those purchases. (*See id.* at 113-14). He had primary use of the Bonneville. (*Id.* at 115). When asked whether plaintiff drove the Bonneville, Mr. Johnson responded: "I mean, very small, little, very small, never really—very little." (*Id.*).

Mr. Johnson testified that in early 2016, he received the money from the title loan, but he "talked plaintiff into going, in her name." (*Id.*). Mr. Johnson testified that he provided the information for the loan application form and interacted with the loan officer. (*Id.*). Mr. Johnson denied giving the loan officer any information about plaintiff's employment to secure the loan. (*Id.* at 117). Mr. Johnson put the Bonneville in plaintiff's name because of his tax issues. (*See id.*). Plaintiff did "not really" have day-to-day use of the Hyundai that Mr. Johnson now drives. (*Id.*).

Mr. Johnson was asked whether he had fraudulently placed into plaintiff's name two vehicles that were really his. (*Id.* at 119). Mr. Johnson declined to answer these questions and asserted his Fifth Amendment right against self-incrimination. (*See id.*).

Mr. Johnson was asked whether he had heard Ms. Banks' testimony that plaintiff had provided the information for the title loan application. (*Id.* at 120). Mr. Johnson responded: "I'm not sure." (*Id.*). Mr. Johnson was reminded of Ms. Banks' testimony that plaintiff produced a license to secure the title loan. (*Id.*). Mr. Johnson was asked whether he or plaintiff gave a license to Ms. Banks for the title loan application. (*Id.* at 120-21). Mr. Johnson responded: "Um, I can't remember." (*Id.* at 121). Mr. Johnson was reminded of Ms. Banks' testimony that plaintiff presented Mubea pay stubs for the loan application and he was asked whether he provided pay stubs to Ms. Banks. He responded: "I can't remember. I never seen it." (*Id.*). Mr. Johnson testified that he never got pay stubs from Mubea indicating that plaintiff was working there to present for purposes of securing a title loan. When asked if he knew where the pay stubs came from, Mr. Johnson responded: "I can't remember. I never seen them. I can't remember that. It was two years ago." (*Id.*). Mr. Johnson was asked whether he made any misrepresentations to Ms. Banks about who owned the Bonneville. (*Id.* at 122). Mr. Johnson declined to answer this question and asserted his Fifth Amendment right against self-incrimination. (*Id.* at 122-23). Mr. Johnson was asked to give a rough estimate of how many times he let plaintiff drive the Bonneville. (*Id.* at 123). He responded: "I can't remember. It was years ago. I really can't." (*Id.*). When asked if he let plaintiff drive the Bonneville more than the two times when she received traffic citations, Mr. Johnson responded: "Um, I can't really remember." (*Id.* at 123-24).

*8. Meloney Johnson's Testimony*

Plaintiff's mother-in-law, Meloney Johnson testified that after defendants seized plaintiff's car, she had contact with plaintiff that she variously characterized as "frequent," "off and on," "all the time," and "a lot." (*Id.* at 133). Ms. Johnson testified that plaintiff would sometimes stay with her for two weeks at a time. When asked how many times plaintiff stayed with her for a two-week period, Ms. Johnson responded: "Mostly all the time. She was there." (*Id.*). Ms. Johnson gave the following testimony concerning whether plaintiff was working after defendants seized her car:

> Q. Now, during this period of time, from the time she lost her car until the present, has she worked at a job?
> A. I don't know. I'm not sure.
> Q. During the time she was staying with you, was she going to work?
> A. Was she going to work during the time she stayed with me? She would leave and catch the bus, you know.
> Q. Do you know where she was going?
> A. No, not all the time.

(*Id.* at 134).

**II. Findings of Fact**

Based on the foregoing discussion of the relevant evidence of record, the findings of fact enumerated below have been established by clear and convincing evidence.[1]

1. Plaintiff lied in her answer to Interrogatory 10 when she stated that the last day she worked at Mubea was April 10, 2015.

2. Plaintiff lied in her answer to Interrogatory 18 when she stated that she had lost income from April 13, 2015 to present due to losing her job at Mubea.

---

[1] The parties have not presented arguments concerning the evidentiary standard that applies in ruling on a motion for sanctions. In an earlier decision that dismissed a plaintiff's case for misconduct that included lying during a deposition, this Court noted a disagreement as to whether findings of fact must be established by a preponderance of the evidence or by clear and convincing evidence. *See Holmes v. U.S. Bank*, No. 1:07-cv-695, 2009 WL 1542786, at *5 n.4 (S.D. Ohio May 28, 2009). In that case, the Court assumed without deciding that the clear and convincing evidence standard applied. *See id.* The Court makes the same assumption in the instant case.

3. Plaintiff lied in her deposition when she stated that she was terminated by Mubea on April 15, 2015 and that she had been unemployed since April 15, 2015.

4. Plaintiff lied in her deposition when she stated that she and her husband did not have a car and had not had a car since the Cadillac was seized by defendants.

5. Plaintiff lied in her November 14, 2016 declaration when she stated that she has not worked at Mubea or anywhere else since April 2015.

6. Plaintiff lied at the evidentiary hearing when she testified that she was not employed at Mubea after April 2015 and did not work there again.

7. Plaintiff lied in her October 2016 opposition to defendants' motion for continuance of the trial when she represented to the Court that a delay in these proceedings has a day-to-day financial impact on her in that defendants' actions have prevented her from acquiring transportation for a job to provide for herself.

8. Based on findings of fact 1-7, the Court finds that plaintiff has acted in bad faith and has engaged in deliberate misconduct in the course of these proceedings by lying in her answers to interrogatories, deposition, declaration, and evidentiary hearing testimony.

Based on the evidence before the Court, plaintiff's repeated contention that she stopped working at Mubea after April 10, 2015 is demonstrably false. Ms. Holte testified that plaintiff worked for Mubea from March 2015 until her termination on May 6, 2016. (Doc. 78 at 52-53). The documentary evidence also establishes that plaintiff was not terminated until May 6, 2016. (*See* Termination Letter dated May 9, 2016, Defendants' Exhibit 5 from Evidentiary Hearing, Doc. 75-4 at 10).

In an attempt to challenge the overwhelming evidence that she worked at Mubea until May 6, 2016, plaintiff stated that she stopped working at Mubea after April 10, 2015 but she allowed an undocumented Senegalese immigrant named Binta to work there under plaintiff's name. (Ndoye Declaration, Doc. 53-1, Exh. A at ¶¶ 3-6). However, this explanation is unbelievable. The documentary evidence establishes that plaintiff signed employee documents at Mubea on April 24, October 15, and November 21, 2015.[2] (*See* Doc. 78 at 55-58; Defendants' Exhibit 5 from Evidentiary Hearing, Doc. 75-4 at 14, 20, 31, 43). When asked to explain how her signature continued to appear on Mubea employment documents long after the date she claimed to have stopped working at Mubea, plaintiff invoked her Fifth Amendment right against self-incrimination. (*See* Doc. 78 at 45-48). However, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a Civil cause.'" *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (quoting 8 J. Wigmore, Evidence 439 (McNaughton rev. 1961)). Thus, from plaintiff's refusal under the Fifth Amendment to explain how her signature came to be on Mubea employment documents after April 10, 2015, the Court can infer that she continued to be employed by Mubea when those documents were signed.

In addition, plaintiff herself relied on evidence of her continued employment at Mubea in obtaining a title loan in January 2016. Plaintiff admitted at the evidentiary hearing that she signed that loan application. (Doc. 78 at 28). In that application, plaintiff indicated that she had been employed at Mubea for two years and that her supervisor's name was Alex. (Doc. 48-6, Exh. F at 1). To show proof of this employment, plaintiff provided a copy of her Mubea pay history for calendar year 2015 as well as her Mubea pay stub from January 9, 2016. (*See* Doc.

---

[2] The signature on these documents matches the signature on documents plaintiff has filed in this case.

48-7, Exh. G; Doc. 78 at 75-76). Plaintiff cannot have it both ways. That is, she cannot rely on her continued employment with Mubea when it benefits her (e.g., to obtain a loan) while concurrently claiming she was unemployed to increase her damages claim in this lawsuit.

The most decisive evidence of plaintiff's continued employment beyond April 10, 2015 is the testimony of her supervisor, Alex Hensley. During the evidentiary hearing, Mr. Hensley identified plaintiff—who was seated directly in front of him when he was on the witness stand— as an employee he supervised from May 2015 until May 2016. (Doc. 78 at 71). Mr. Hensley further testified that plaintiff was the only Senegalese immigrant with whom he has ever interacted at Mubea. (*See id.* at 72-73). In other words, plaintiff's direct supervisor for over a year did not confuse her with the enigmatic "Binta." The Court finds Mr. Hensley's testimony to be credible. There is no discernable reason for Mr. Hensley, a disinterested non-party to this lawsuit, to misrepresent plaintiff's employment status at Mubea.

In a further effort to minimize the overwhelming evidence of her continued employment at Mubea through May 2016, plaintiff at the evidentiary hearing emphasized alleged discrepancies in her phone records and payroll records. However, the Court gives no evidentiary weight to these purported discrepancies. First, although the Court directed Ms. Holte to produce to plaintiff on Mubea's behalf the record of days and hours that plaintiff worked in April 2015 and March 2016, plaintiff has not supplemented the record to include those documents. (*See* Doc. 78 at 69-70). Plaintiff contended at the evidentiary hearing that these records in conjunction with her phone records would show that she made numerous phone calls to her attorney and the Legal Aid Society of Cincinnati at times when she was supposed to be working at Mubea. (*See id.* at 67). Presumably, the import of such evidence would be to support her claim that "Binta" was working under plaintiff's name at Mubea while plaintiff was elsewhere

making phone calls. However, plaintiff has not produced any evidence from Mubea to show that she was working at the times those calls were made. Further, even if she had produced such evidence, the phone records that plaintiff has submitted show only the times that she placed calls to her attorney and Legal Aid, not the duration of those calls. (*See* Doc. 74-1 at 45-46, 52). Thus, even if there were evidence that plaintiff was working at Mubea when the calls were made, it does not follow that Binta must have been working in her place. An equally if not more plausible explanation would be that plaintiff herself made the calls at Mubea during her breaks or at lunch.

Second, plaintiff contends that the change in her bank routing and account numbers in May 2015 is evidence that she was no longer the person receiving paychecks under her name from Mubea. (*See* Doc. 80 at 17-18). However, the evidence regarding the two bank accounts has little probative value. Plaintiff appears to suggest the documents showing a change in the bank accounts for the direct deposit of her wages is circumstantial evidence that "Binta" was now receiving "plaintiff's" paycheck or wages from Mubea. However, there is no evidence before the Court identifying who owned this second bank account. Plaintiff was never asked whether she owned this second bank account and she never disavowed ownership of the account to which her paycheck was deposited. For the Court to conclude that this second bank account was owned by "Binta" and not plaintiff would be sheer speculation. In addition, plaintiff continued receiving the direct deposit of her paycheck into the first bank account she admitted to owning for two pay periods after she alleges she stopped working (Doc. 74-2, PAGEID#: 1271, 1272) despite testifying that she never received any income in the form of wages or benefits from Mubea after April 10, 2015. (Doc. 78 at 48). In short, any conclusion to be drawn from the

change in plaintiff's bank information is wholly speculative. Therefore, the Court gives no

weight to the change in plaintiff's bank account information in May 2015.

Based on the overwhelming weight of the evidence, the Court is left with the firm belief

and conviction that the only possible conclusion is that plaintiff worked at Mubea until May 6,

2016. *See Holmes*, 2009 WL 1542786, at \*5 n.4 (explaining that evidence is clear and

convincing when it "produces in the mind a firm belief or conviction as to the matter at issue")

(quoting 3 O'Malley, et al., Federal Jury Practice & Instructions § 104.02 (5th ed. 2000)). Thus,

the Court finds by clear and convincing evidence that plaintiff lied about her continued

employment with Mubea in her answers to interrogatories, deposition, declaration, and

evidentiary hearing testimony (i.e., Findings of Fact 1-3 and 5-6).

In addition to plaintiff's continued employment at Mubea until May 6, 2016, the record

also contains clear and convincing evidence that plaintiff worked at L'Oreal in May 2016. Ms.

Eversole testified that plaintiff's file with staffing agency CM Personnel showed that plaintiff

was placed in a job with L'Oreal in May 2016 and was terminated on June 1, 2016 for

attendance problems. (Doc. 78 at 92, 98). Plaintiff herself admitted at the evidentiary hearing

that she worked at L'Oreal for four days. (*Id.* at 22). While plaintiff characterized this

employment as "just a tryout job" and therefore not a job, this position and the earnings she

made from it were clearly relevant to the issue of damages. (*See id.*). Thus, plaintiff's brief

employment at L'Oreal in May 2016 constitutes additional evidence for the Court's finding that

plaintiff lied in her November 2016 declaration when she stated that she has not worked at

Mubea *or anywhere else* since April 2015 (i.e., Finding of Fact 5).

As to whether plaintiff misrepresented whether she purchased, owned, or had access to a

car after defendants seized the Cadillac on April 10, 2015, the record shows by clear and

convincing evidence that she lied in her March 2016 deposition when she stated that she and her

husband did not have a car and had not had a car since the Cadillac was seized (i.e., Finding of

Fact 4). First, title records show that a Pontiac Bonneville was titled in plaintiff's name with a

purchase date of June 27, 2015 and a Volkswagen Jetta was titled in her name with a purchase

date of July 6, 2015. (*See* Doc. 48-4, Exh. D at 3-4; Doc. 48-5, Exh. E at 1-2). Second, plaintiff

received traffic citations while driving the Pontiac Bonneville on March 10 and April 26, 2016.

(*See* Doc. 48-2, Exh. B at 2; Doc. 48-3, Exh. C at 3). Third, in applying for a title loan on the

Pontiac Bonneville in January 2016, plaintiff provided a copy of a title in her name and

represented to the loan officer that she owned the car. (*See* Doc. 78 at 75, 77). While plaintiff

and her husband downplayed plaintiff's involvement in their evidentiary hearing testimony, their

testimony is not credible. Specifically, Mr. Johnson's testimony was evasive in that he claimed

not to remember whenever providing an answer would hurt plaintiff's case. (*See id.* at 120-24).

Further, the testimony of plaintiff and her husband about plaintiff's involvement in securing the

title loan was flatly contradicted by the testimony of Ms. Banks—a neutral, disinterested

witness—that plaintiff represented the Bonneville belonged to her and provided the required

information for the loan application. (*See id.* at 75-77, 80). Fourth, plaintiff testified at the

evidentiary hearing that she had occasional access to the vehicles. (*Id.* at 17). Even if the Court

were to believe plaintiff's testimony that her husband purchased the cars on his own, such that

she did not lie in her answer to Interrogatory 22 by not listing them as cars she had purchased,

she still lied about her access to the cars in her deposition. That is, even if plaintiff herself did

not purchase these cars, the foregoing evidence conclusively shows that contrary to her

deposition testimony, she and her husband had a car after the Cadillac was seized in April 2015.

Thus, clear and convincing evidence shows that plaintiff lied in her deposition when she stated

that she and her husband did not have a car and had not had a car since the Cadillac was seized

(i.e., Finding of Fact 4).

Finally, the Court finds by clear and convincing evidence that based on plaintiff's lies

underlying Findings of Fact 1-7, plaintiff has acted in bad faith and has engaged in deliberate

misconduct in the course of these proceedings (i.e., Finding of Fact 8). The only possible reason

that plaintiff had to repeatedly lie about her continued employment with Mubea and access to a

car was to fraudulently inflate the amount of her damages claim related to defendants' alleged

wrongdoing. With these factual findings established, the Court must now determine whether

plaintiff's misconduct during these proceedings is sanctionable.

## III. Sources for Sanctions

In their motion, defendants invoke the Court's inherent power and Federal Rules of Civil

Procedure 11, 37, 41, and 60 as sources for sanctioning plaintiff's false statements. While a case

might be made for sanctions under Rules 37, 41, and 60, defendants have failed to articulate the

basis for sanctions under those rules. Thus, the Court declines to consider whether sanctions are

appropriate under those rules. Additionally, the Court will not impose sanctions under Rule 11

because defendants failed to comply with the safe harbor provision of that rule.[3] Instead, the

Court will consider the legal standard for sanctions under the Court's inherent power, which

provides a strong basis for sanctioning plaintiff's misconduct in this case.

"A district court may impose sanctions pursuant to its inherent authority 'to control the

litigants before it and to guarantee the integrity of the court and its proceedings.'" *Holmes*, 2009

---

[3] A party seeking sanctions under Rule 11 must follow a two-step process: "first, serve the Rule 11 motion on the opposing party for a designated period (at least twenty-one days); and then file the motion with the court." *Ridder v. City of Springfield*, 109 F.3d 288, 294 (6th Cir. 1997). This process, known as the safe harbor provision, is an "absolute requirement." *Id.* at 296. Because defendants discovered that plaintiff made false statements in her answers to interrogatories and deposition and filed their motion for sanctions only four days later on October 25, 2016, they could not have complied with the safe harbor provision of Rule 11.

WL 1542786, at *6 (quoting *First Bank of Marietta*, 307 F.3d at 512). Courts may exercise their inherent authority to sanction a party who has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," or who has engaged in conduct that was "tantamount to bad faith." *Laukus*, 292 F.R.D. at 502-03 (quoting *Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011)).

Here, as explained in the Court's findings of fact, plaintiff acted in bad faith throughout these proceedings in an effort to fraudulently inflate the amount of her damages claim at trial. Plaintiff concedes that the Court has the inherent authority to sanction a party for abuse of the judicial process, but argues that her misconduct does not rise to a level for which sanctions are appropriate. (*See* Doc. 53 at 7-8; Doc. 80 at 5-12, 19-21). The Court disagrees. Plaintiff's persistent lies throughout these proceedings, including in her answers to interrogatories, deposition, declaration, and evidentiary hearing testimony warrant sanctions under the Court's inherent power. *See Laukus*, 292 F.R.D. at 505 (finding sanctions warranted under court's inherent power where plaintiff "provided false deposition testimony, verified misleading and evasive discovery responses, neglected to correct inaccurate discovery responses, and failed to correct improper arguments made on his behalf by his counsel"). *See also Englebrick v. Worthington Indus., Inc.*, 944 F. Supp.2d 899, 908 (C.D. Cal. 2013) (imposing inherent power sanctions where plaintiffs lied under oath in discovery responses and at deposition); *Holmes*, 2009 WL 1542786, at *7-8 (finding inherent power sanctions warranted where plaintiff attempted "to undermine the truth-seeking function of a trial" by "withholding documents and lying during her deposition"); *Knapp v. Convergys Corp.*, 209 F.R.D. 439, 442 (E.D. Mo. 2002) (finding inherent power sanctions warranted where plaintiff abused the judicial process by lying during her deposition and in her answers to interrogatories).

Plaintiff argues that inherent power sanctions may not be imposed for "conflicting testimony going to the merits of the case" but only for misconduct "which has impacted the judicial process itself." (Doc. 80 at 19). However, the Court finds that plaintiff's misconduct has egregiously subverted the integrity of the judicial process:

> Lying cannot be condoned in any formal proceeding. *See ABF Freight Sys., Inc. v. N.L.R.B.*, 510 U.S. 317, 323 (1994) ("False testimony in a formal proceeding is intolerable."). Our legal system is dependent on the willingness of the litigants to allow an honest and true airing of the real facts. As our colleague Judge Gettleman has stressed: "parties who wish to use the judicial system to settle disputes have certain obligations and responsibilities. One of those responsibilities is to tell the truth in a deposition." *Rodriguez v. M & M/Mars*, No. 96 C 1231, 1997 WL 349989, at *2 (N.D. Ill. June 23, 1997) (dismissed plaintiff's case for lying about her prior criminal record in a deposition). This Court, too, has a responsibility: where we find deliberate falsehoods told in proceedings, we cannot allow such conduct to go unchecked. Turning a blind eye to false testimony erodes the public's confidence in the outcome of judicial decisions, calls into question the legitimacy of courts, and threatens the entire judicial system. *See* Lisa C. Harris, *Perjury Defeats Justice*, 42 Wayne L.Rev. 1755, 1756 (1996).

*Quela v. Payco-Gen. Am. Creditas, Inc.*, No. 99 C 1904, 2000 WL 656681, at *7 (N.D. Ill. May 18, 2000). Further, the Seventh Circuit has held that a plaintiff "abuse[s] the judicial process by seeking relief based on information that the plaintiff knows is false." *Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 401 (7th Cir. 2015). The Seventh Circuit explained:

> [F]alsifying evidence to secure a court victory undermines the most basic foundations of our judicial system. If successful, the effort produces an unjust result. Even if it is not successful, the effort imposes unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly.

*Id.* at 402 (citing *Rivera v. Drake*, 767 F.3d 685, 686-87 (7th Cir. 2014)). Consistent with the reasoning of these courts, the Court finds that plaintiff's repeated false statements throughout these proceedings, if unchecked, would profoundly threaten the integrity and vitality of our judicial system, which rests on a foundation of laws not lies.

Accordingly, defendants' motion for sanctions under the Court's inherent power is

**GRANTED**.  The Court will now determine the appropriate sanction for plaintiff's misconduct.

## IV.  The Proper Sanction for Plaintiff's Misconduct

Defendants argue that plaintiff's misconduct warrants dismissal of her claims.  The Court

agrees.

Courts consider the following factors in determining whether to dismiss a party's lawsuit

as a sanction:

> (1) whether the party's conduct is due to willfulness, bad faith or fault; (2)
> whether the adversary was prejudiced by the dismissed party's conduct; (3)
> whether the dismissed party was warned that failure to cooperate could lead to
> dismissal; and (4) whether less drastic sanctions were imposed or considered
> before dismissal was ordered.

*Laukus*, 292 F.R.D. at 509 (quoting *United States v. Reyes*, 307 F.3d 451, 458 (6th Cir. 2002)).

"Although 'none of the factors is outcome dispositive, . . . a case is properly dismissed by the

district court where there is a clear record of delay or contumacious conduct.'"  *Id.* (quoting

*Schafer v. City of Defiance Police Dep't*, 529 F.3d 731, 737 (6th Cir. 2008)).  The Court will

consider each factor in turn.

### A.  Willfulness, Bad Faith, or Fault

As the Court explained in its findings of fact, plaintiff acted in bad faith by lying in her

answers to interrogatories, deposition, declaration, and evidentiary hearing testimony.  The only

motive plaintiff could have to repeatedly lie about her continued employment at Mubea, even

after her lies were exposed, was to inflate the amount of her damages claim at trial.  Her

misconduct during these proceedings can only be characterized as willful and in bad faith.  *See*

*Laukus*, 292 F.R.D. at 510 (finding that plaintiff's concealment of a material document, evasive

and misleading discovery responses, and motive to increase damages supported a finding of

willfulness and bad faith). *See also Englebrick*, 944 F. Supp.2d at 909 ("Providing false or

incomplete information during a deposition or in a response to a discovery request constitutes the

sort of willfulness, bad faith, or fault required for dismissal."). Therefore, the first factor weighs

heavily in favor of dismissal.

### B. Prejudice to Defendants

Plaintiff argues that defendants have not been prejudiced because even if loss of income

damages are not available, plaintiff is still entitled to other damages. (*See* Doc. 80 at 20).

Plaintiff contends that defendants are not prejudiced because they are still able to make

arguments concerning the proper amount of damages at trial. (*See id.*). Plaintiff's argument

ignores the prejudicial effect of her material falsehoods on the discovery, motion, and mediation

proceedings in this case.

The "inability to discover highly relevant information and documents" impairs a litigant's

ability to prepare for and defend the claims in the case. *Laukus*, 292 F.R.D. at 511. Moreover,

the presentation of false information during the discovery process inhibits a litigant's ability to

make informed decisions on settlement, which is dependent on accurate and truthful information.

*See Quela*, 2000 WL 656681, at *7. A finding of prejudice is warranted where the plaintiff's

discovery misconduct deprives the defendants "of their right to discoverable evidence which they

could have used on summary judgment, on appeal, in mediation, and in pre-trial motions before

this Court." *Laukus*, 292 F.R.D. at 511.

Here, plaintiff's continued lies impaired defendants' ability to prepare their case with

respect to the issue of plaintiff's damages claim. Plaintiff's persistent lies throughout this action

call into question the validity of these proceedings in their entirety, including the parties'

dispositive motion practice and the failed mediation. As the *Laukus* court explained: "For all

intents and purposes, in light of the newly-revealed evidence, the case would need to start from

the beginning to afford defendants further opportunity to conduct discovery and, if appropriate,

file dispositive motions." *Id.* In short, if this action is not dismissed as a sanction for plaintiff's

egregious misconduct, these proceedings will be prolonged and the cost to defendants will

increase. *See Englebrick*, 944 F. Supp.2d at 912 (finding that plaintiffs' deception prejudiced

defendant given the "enormous amounts of time and money" defendant had already spent

defending the action). The Court can only find that plaintiff's conduct has prejudiced

defendants. Therefore, the second factor weighs heavily in favor of dismissal.

### C. Prior Warnings

The Sixth Circuit has explained that when a plaintiff has not received notice that

dismissal is contemplated, "a district court should impose a penalty short of dismissal unless the

derelict party has engaged in bad faith or contumacious conduct." *Harmon v. CSX Transp., Inc.*,

110 F.3d 364, 367 (6th Cir. 1997) (quotation marks omitted) (quoting *Harris v. Callwood*, 844

F.2d 1254, 1256 (6th Cir. 1988)). Even if a plaintiff is not warned by the Court that dismissal is

a possibility, this factor is less relevant "where the conduct at issue is not merely contestable, but

in contravention of basic notions of fairness . . . . A party does not need formal notice to know

that . . . misrepresentations may lead to dismissal." *Fharmacy Records v. Nassar*, 248 F.R.D.

507, 530 (E.D. Mich. 2008). In *Laukus*, the court found "there was no opportunity or apparent

need for the Court to provide a prior warning to plaintiff . . . because the discovery misconduct

was not discovered until . . . after the close of discovery and within weeks of trial." 292 F.R.D.

at 512. The *Laukus* court also concluded that it was not "necessary to warn a party that the

offering of knowingly false deposition testimony or evasive discovery responses, or the

concealment of highly relevant discovery, might compromise one's ability to continue to litigate

in federal court." *Id.  See also Archibeque v. Atchison*, 70 F.3d 1172, 1175 (10th Cir. 1995) (finding dismissal appropriate even without notice that dismissal was imminent when plaintiff offered knowingly false deposition testimony).

Here, as the Court has already explained, plaintiff's pattern of lies throughout these proceedings can only be characterized as bad faith.  Thus, the Court may impose the sanction of dismissal even if plaintiff has not received notice of the possibility of dismissal.  *See Harmon*, 110 F.3d at 367.  However, plaintiff arguably received notice that the Court was contemplating dismissal of her action because defendants specifically requested dismissal as the appropriate sanction for plaintiff's lies in her answers to interrogatories and deposition.  *See id.* at 368 (finding the plaintiff was on notice that the district court was contemplating dismissal of the complaint when the defendant had filed a motion to dismiss).  Even though plaintiff knew that defendants were seeking the sanction of dismissal, her response was to double down on her lies by filing a false declaration and providing false testimony at the evidentiary hearing.  Given the nature of plaintiff's misconduct, no additional warning that her repeated misrepresentations could result in dismissal was required.  *See Laukus*, 292 F.R.D. at 512; *Fharmacy Records*, 248 F.R.D. at 530; *Archibeque*, 70 F.3d at 1175.  Therefore, the third factor weighs in favor of dismissal.

### D. Lesser Sanctions

"In determining whether to dismiss a case due to a discovery violation, a district court should consider lesser sanctions." *Laukus*, 292 F.R.D. at 512 (citing *Reg'l Refuse Sys., Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 155-56 (6th Cir. 1988)).  However, "while it would be inappropriate to dismiss without considering the severity of this sanction and the availability of lesser sanctions, it is not an abuse of discretion to dismiss, even though other sanctions might be

workable, if dismissal is supportable on the facts." *Id.* (quoting *Reg'l Refuse Sys., Inc.*, 842 F.2d at 155). In determining the appropriate sanction, the Court must consider "that the goals of sanctions are to punish the offender and to deter others from engaging in similar misconduct in the future." *Holmes*, 2009 WL 1542786, at *8 (citing *Taylor v. Medtronics, Inc.*, 861 F.2d 980, 985-86 (6th Cir. 1988)).

Here, the Court finds that no sanction less than dismissal would adequately punish plaintiff's egregious misconduct. Plaintiff argues that the Court should not impose sanctions at all because this case "is not unlike the great majority of civil disputes where one or both sides accuse the other of lying." (Doc. 80 at 21). This argument is wholly unpersuasive in light of the clear and convincing evidence that plaintiff has consistently lied throughout these proceedings in bad faith. *See Holmes*, 2009 WL 1542786, at *9 (rejecting plaintiff's argument "that simply allowing the defense to probe . . . all of these issues before the jury would be sufficient" because it "is tantamount to imposing no sanction at all"). To impose no sanction at all and "let the jury decide" as plaintiff urges (*see* Doc. 53 at 5; Doc. 80 at 21) would leave unredressed the havoc that plaintiff's actions have wreaked on these proceedings and the judicial process and provide plaintiff with yet another opportunity to subvert the integrity of the judicial process at trial. *See Lucas v. Jos. A. Bank Clothiers, Inc.*, No. 14-cv-1631, 2016 WL 6698935, at *6 (S.D. Cal. Nov. 15, 2016) ("Faced with the kind of litigation misconduct established here, a court is duty bound to take action to redress it, and to try to deter future misconduct. To do nothing . . . creates a risk that courts will be viewed by unscrupulous litigants as an organ for committing fraud."). *See also Holmes*, 2009 WL 1542786, at *9 ("At trial, Defendants would properly be entitled to explore all of these areas of misconduct with the jury because they are probative of her

27

credibility or lack thereof. Simply allowing the Defendants to do what they would be entitled to do lets Plaintiff off scot free for her misconduct.").

Further, the Court has considered the possibility of striking plaintiff's claim for loss of employment damages as a lesser sanction. However, this remedy is entirely inadequate as it would merely place plaintiff in the position in which she would have been had she not lied throughout these proceedings. *See Laukus*, 292 F.R.D. at 513 ("This sanction would do nothing more than place plaintiff in the position in which he would have been had he properly engaged in discovery."). That is, the evidence conclusively shows that as a matter of law, plaintiff is not entitled to loss of employment damages. Thus, allowing plaintiff to proceed to trial but striking her claim for loss of employment damages would be an empty gesture.

As another alternative, the Court could allow defendants to refile their motion for summary judgment in light of the newly discovered evidence of plaintiff's continued employment with Mubea. However, this remedy "would not compensate defendants for the time and expense associated with litigating this action under false pretenses" for nearly two years. *Laukus*, 292 F.R.D. at 513.

In sum, given the seriousness of plaintiff's misconduct, dismissal of this action is the only adequate sanction. Plaintiff's persistent lies throughout these proceedings demonstrate an utter disregard for the integrity of the judicial process, defendants, defense counsel, and the Court. Therefore, the fourth factor weighs in favor of dismissal.

"[T]he importance of accurate and truthful discovery to the civil justice system cannot be overstated." *Quela*, 2000 WL 656681, at *7. Plaintiff's deliberate falsehoods have subverted the truth-finding process of these judicial proceedings and no sanction short of dismissal would adequately serve the goals of punishment and deterrence. For this reason, the Court vacates its

grant of partial summary judgment for plaintiff, grants defendants' motion for sanctions, and dismisses all of plaintiff's claims in this case.

## V. Reasonable Costs and Attorneys' Fees

Defendants argue that they "are entitled to reasonable costs and attorney fees arising out of and as a direct result of Plaintiff's intentional misrepresentations." (Doc. 79 at 2). The Court agrees. As the Court explained above, defendants have been prejudiced by plaintiff's lies throughout these proceedings, which have prolonged the resolution of this matter and increased the costs to defendants. While dismissal of this action addresses the harm plaintiff has inflicted on the judicial system, dismissal does not fully alleviate the harm to defendants. *See Lucas*, 2016 WL 6698935, at *6 (merely dismissing the action of a plaintiff who had lied under oath at his deposition and during a sanctions hearing would insufficiently address the plaintiff's misconduct, the effect of which "was to sabotage two years of expensive litigation to the detriment of all involved"). The Court is duty bound to address the monetary harm to defendants that plaintiff has inflicted through her misconduct. Accordingly, defendants' request for reasonable costs and attorney fees is **GRANTED**. By separate order, the Court will enter a briefing schedule for the parties to address the reasonable amount of costs and attorney fees that defendants expended as a result of plaintiff's misconduct.

## VI. Conclusion

Consistent with the foregoing, defendants' motion for sanctions (Doc. 48) is **GRANTED** and plaintiff's claims are **DISMISSED WITH PREJUDICE**. The Court's prior order granting partial summary judgment on plaintiff's claim under Ohio Rev. Code § 1345.02(A) (Doc. 37) is **VACATED**. Defendants' request for reasonable costs and attorney fees is **GRANTED**. The

parties will brief the reasonable amount of costs and attorney fees to be assessed against plaintiff pursuant to a briefing schedule to be entered by separate order.

     **IT IS SO ORDERED.**

Date: 3/1/17

Karen L. Litkovitz
United States Magistrate Judge